# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UFCW LOCAL 1500 WELFARE FUND, on behalf of itself and all others similarly situated,

*Plaintiff*,

v.

MYLAN, INC.; MYLAN PHARMACEUTICALS INC.; and SANDOZ, INC.,

*Defendants*.

Civil Action No.

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

1.      Plaintiff UFCW Local 1500 Welfare Fund, on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust laws to recover damages and obtain injunctive and equitable relief for the substantial injuries it and others similarly situated have sustained against Defendants arising from their conspiracy to raise the prices of and allocate markets and customers for generic benazepril and hydrochlorothiazide tablets ("Benazepril HCTZ"), in the United States. Plaintiff's claims arise from a set of conspiracies by numerous generic drug manufacturers, including Defendants here, to unlawfully fix, raise, maintain and stabilize the prices of more than a dozen generic drugs, including the one at issue in this Complaint. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## <u>NATURE OF THE ACTION</u>

2.      Benazepril HCTZ is a commonly prescribed medication to treat wheezing and shortness of breath caused by among other things, asthma and chronic obstructive pulmonary

disease. Significantly, this drug is not new: Benazepril HCTZ has been on the U.S. market since the early 1990s, and generic versions have also been available since 2004.

3.      In the pharmaceutical industry, the entry of generic versions of branded drugs usually results in aggressive price competition, which in turn reduces prices for drug wholesalers, retail pharmacies, consumers, and third party payors. Defendants here, however, conspired to thwart the economic benefits of generic competition by agreeing to fix and raise prices and rig bids for, and allocate customers of, generic Benazepril HCTZ. Indeed, Defendants here have raised their prices for Benazepril HCTZ **over 300%** between October 2013 and April 2014.

4.      Defendants orchestrated their conspiracy through secret communications and meetings, both in private and at public events, such as trade association meetings held by the Generic Pharmaceutical Association ("GPhA"), National Association of Chain Drug Stores, and Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), among others.

5.      Defendants here were not alone in subverting the operation of a competitive marketplace for generic pharmaceuticals. Defendants' anticompetitive conduct in the Benazepril HCTZ market is part of a series of conspiracies involving at least a dozen generic drug manufacturers and as many as two-dozen generic drugs. Indeed, commenting on the scope of its current antitrust investigation, the Connecticut Attorney General George Jepsen stated that "[t]he issues we're investigating go **way beyond** the two drugs and six companies [that are the subject

of civil lawsuit brought by, at first 20, and now 40, state attorneys general]. ***Way beyond…We're learning new things every day***."[1]

6.      Defendants' and other generic manufacturers' conduct has grabbed the attention of government enforcers, members of Congress, the press, and drug purchasers. The Department of Justice's Antitrust Division ("DOJ") and the Connecticut Attorney General's Office ("CTAG")—which is leading a multi-state working group of state attorneys general—are conducting sweeping antitrust probes into allegations that generic drug manufacturers participated in conspiracies to fix prices and rig bids for, and allocate customers of, various generic drugs.

7.      Indeed, on December 12 and 13, 2016, the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek.[2] DOJ alleged that both Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline sold in the United States. Each was charged with two felony counts under the Sherman Act (15 U.S.C. §1). On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.

8.      Soon after the DOJ filed criminal charges, 20 state attorneys general also sued Aurobindo, Citron, Heritage, and Teva, as well as Mayne Pharma and Mylan for bid-rigging, price-fixing and customer allocation in connection with their sale of glyburide and doxycycline in the United States. More recently, the DOJ intervened in the civil antitrust action brought by direct-purchasers of propranolol in the Southern District of New York and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal

---

[1] Liz Szabo, et al., How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices, The Daily Beast (Dec. 21, 2016), http://thebea.st/2haV9xg.

[2] *United States v. Glazer*, No. 16-cr-506 (E.D. Pa. Dec. 12, 2016); *United States v. Malek*, No. 16-cr-508 (E.D. Pa., Dec. 13, 2016).

investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the informations that were unsealed."[3]  On March 1, 2017, the state attorneys general complaint was amended to, *inter alia*, add claims of an additional 20 state attorneys general, bringing the total number of state AGs prosecuting the action to 40.  The DOJ and state attorneys general filings stem from long-running investigations and the issuance, by a federal grand jury proceeding in the Eastern District of Pennsylvania, of subpoenas relating to price fixing in the generic drug industry.

9.      In addition to DOJ's and CTAG's investigations, members of Congress have written letters to generic manufacturers Actavis, Apotex, Impax, Lannett, Mylan, Par, Sun, Teva, West-Ward, and Zydus, requesting information concerning their sales of numerous generic drugs, including albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, and Benazepril HCTZ.

10.     The ongoing civil and criminal investigations could also result in the imposition of substantial fines against many generic drug manufacturers, including those named as Defendants here. One analyst has estimated, for example, that Teva could face liability of between $300 million and $700 million, while Mylan could face liability of between $380 million and $770 million. Another analyst estimated that fines industry-wide could exceed $1 billion.[4]

---

[3] *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, 16 CV 09901 (JSR), 17 CV 00078 (JSR), 17 CV 00980 (JSR) 17 CV 01039 (JSR), February 21, 2017 Tr. at 10, 11.

[4] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

11.     As a result of Defendants' scheme to rig bids, fix and maintain prices for, and allocate customers of, generic Benazepril HCTZ, consumers and third-party payors paid, and continue to pay, supracompetitive prices for these generic drugs.

12.     Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is composed of all individuals and entities in the United States or its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for Benazepril HCTZ, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as October 1, 2013 through the present.

13.     The second class (the "Damages Class") is composed of all individuals and entities who, in Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia, indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for Benazepril HCTZ, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as October 1, 2013 through the present.

## JURISDICTION AND VENUE

14.     Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief and costs of suit, including attorneys' fees, against Defendants for the injuries that Plaintiff and the other members of the Injunctive Class have suffered from Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. § 26, because this action arises

under the federal antitrust laws. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000 and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

18.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

19.     Defendants sold and shipped Benazepril HCTZ in a continuous and uninterrupted flow of interstate commerce. The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate and intrastate commerce.

20.     Each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

## THE PARTIES

### A.     Plaintiff

21.     Plaintiff UFCW Local 1500 Welfare Fund ("**Local 1500**") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York, 11590. Local 1500 provides nearly 23,000 members with health and welfare benefits, many of whom live in New York, among other states. Local 1500 purchased and paid for some or all the

purchase price for Benazepril HCTZ, thereby suffering injury to its business and property. Local 1500 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

**B.**     **Defendants**

22.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

23.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.

24.     Together Defendants Mylan Inc. and Mylan Pharmaceuticals, Inc. are together referred to as "**Mylan**." During the Class Period, Mylan sold Benazepril HCTZ in the United States.

25.     Defendant Sandoz, Inc. ("**Sandoz**") is a Colorado corporation with its principal place of business in Princeton, New Jersey.  During the Class Period, Sandoz sold Benazepril HCTZ in the United States.

26.     Together Defendants Mylan and Sandoz are referred to collectively as "**Defendants**."

27.     All Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint, and were authorized, ordered, or done by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, or with the actual, apparent, or ostensible authority of Defendants.

28.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

**GENERIC DRUGS REDUCE PRESCRIPTION DRUG COSTS
TO PATIENTS AND THIRD-PARTY PAYORS**

29.     When generic versions of a branded drug—whether a generic manufactured and sold by an independent generic manufacturer or an "authorized generic," or "branded generic," sold by or pursuant to an agreement with the branded manufacturer—enter the market, they quickly gain substantial market share.

30.     Empirical studies have shown that within a year of generic entry, generics typically will have obtained about 90% of the market, *i.e.*, pharmacists will fill 90 of every 100 prescriptions with a generic. Indeed, according to IMS Health data, generic drugs as a whole have increased the share of total prescriptions steadily since 2004, and as of 2013, account for 86% of all drugs dispensed in the United States.[5]

---

[5] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.



**Percent share of prescriptions**

Source: IMS Health, National Prescription Audit, Jan 2014

31.     When generic drugs are launched, they are typically priced below the prices of their branded counterparts. Indeed, in a competitive market, each successive generic product that enters the market lowers the prices of all similar generic products because each entry increases competition for sales and market share. A Food and Drug Administration ("FDA") study demonstrates this effect in the following chart:[6]

---

[6] FDA, Generic Competition and Drug Prices, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

32.    More recent evidence obtained by the GAO suggests that each subsequent generic entrant drives the price down by 20%.

33.    A Federal Trade Commission study confirmed the FDA's analyses, finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[7]

34.    Thus, generic competition to even a single brand drug can potentially provide billions of dollars in savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs, which reimburse the cost of drug purchases by covered individuals. Indeed, one study found that the use of generic medicines saved the U.S. healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[8]

---

[7] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.

[8] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

35. These consumer welfare-enhancing attributes of generic drug competition were bolstered by the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act." The Hatch-Waxman Act simplifies the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Instead of filing a lengthy and costly New Drug Application ("NDA"), the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA").

36. If an ANDA applicant shows that the generic drug is bioequivalent to the brand drug, then the ANDA applicant may rely on scientific and other data compiled in the brand drug's NDA, including safety and efficacy data. The ability to rely on the scientific data published in the referenced brand drug's NDA obviates the need for duplicative and expensive experimentation and clinical trials. The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the requirements under the Hatch-Waxman Act.

37. In connection with the approval of a generic drug, the FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX." An "AB" rating signifies that the approved generic product is therapeutically equivalent to its branded counterpart. An AB rating is significant because under state generic drug substitution laws, pharmacists are permitted—and, in many cases, required—to substitute the branded product for its cheaper generic counterpart. Moreover, in about 20 states, non-AB rated generic drugs can be substituted for their branded counterparts subject to certain considerations, including informed consent from patient or

physician and whether the switch is appropriate in a pharmacist's professional judgment.[9] This inures to the financial benefit of consumers and third-party payors.

38.     In sum, the streamlined approval process under the Hatch-Waxman Act makes it easier for generic drug manufacturers to bring competing and cheaper generic products to market.

## THE BENAZEPRIL HCTZ  MARKET

39.     Benazepril HCTZ is combination of two drugs—an angiotensin-converting enzyme (ACE) inhibitor (benazepril hydrochloride) and a water pill/diuretic (hydrochlorothiazide). Benazepril HCTZ is used to lower high blood pressure, prevent strokes, and heart attacks. Benazepril HCTZ is marketed in the following dosages: 5mg/6.25mg, 10mg/12.5mg, 20mg/12.5mg, and 20mg/25mg. The first FDA-approved Benazepril HCTZ product is marketed under the name Lotensin HCT®.

40.     Generics were first approved in 2004. By 2005, there were at least six companies approved to manufacture generic versions of Benazepril HCTZ: Actavis Laboratories, Genpharm Inc., Ivax Pharmaceuticals, Mylan, Sandoz, and Sun Pharmaceutical Industries. However, the market has since consolidated, leaving only three companies—Mylan, Sandoz, and Apotex Inc. ("Apotex")—with approval to market and sell generic versions of Benazepril HCTZ, with Apotex only having received FDA approval in August 2014.

## DEFENDANTS' WRONGDOING

41.     As part of their conspiracy, Defendants agreed to raise the prices of Benazepril HCTZ sold in the United States. Defendants orchestrated their conspiracy through in-person meetings at trade association and industry meetings.

---

[9]
http://pharmacistsletter.therapeuticresearch.com/pl/ArticleDD.aspx?nidchk=1&cs=&s=PL&pt=2&segment=1186&dd=220901&AspxAutoDetectCookieSupport=1.

42.     Beginning at least as early as October 1, 2013, Defendants caused the price of Benazepril HCTZ to dramatically increase in unison. The increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Benazepril HCTZ in the United States. The agreement was furthered by discussions held at GPhA meetings, including a meeting in Bethesda, Maryland in October 2013 that was attended by Defendants, as well as other meetings and communications.

43.     Defendants sold Benazepril HCTZ between October 2013 and the present. During this period, average prices for Benazepril HCTZ increased market-wide by over ***300%***, as seen in the price chart below, which is taken from a letter that Senator Bernie Sanders and Representative Elijah Cummings sent to Mylan.

|  | *Benazepril HCTZ, October 2013* | *Benazepril HCTZ, July 2014* | *Percentage Price Increase* |
|---|---|---|---|
| **12.5-20mg, 100 tablets** | $34 | $149 | *338%* |
| **20-25mg, 100 tablets** | $34 | $149 | *338%* |
| **5-6.25mg, 100 tablets** | $34 | $149 | *338%* |

44.     The Benazepril HCTZ pricing data in the graphs below also show staggering price increases for Benazepril HCTZ at the retail pharmacy level. These data found in these graphs are derived from the Centers for Medicare and Medicaid Services' ("CMS") National Average Drug Acquisition Cost ("NADAC") database. Defendants' price increases were, for the most part, in lockstep.









45.     Defendants' conduct cannot be explained by normal competitive forces. Rather, Defendants sustained these supracompetitive profits by conspiring to rig bids, fix, raise, and maintain the prices of, and allocate markets and customers for, Benazepril HCTZ. The price increases were the product of Defendants' shared desire to extract monopoly rents from captive drug purchasers.

46.     In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale of Benazepril HCTZ in the United States;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for Benazepril HCTZ sold in the United States;

(c)     Agreeing during those meetings, conversations, and communications to allocate customers for Benazepril HCTZ sold in the United States;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Benazepril HCTZ sold in the United States;

(e)     Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

(f)     Selling Benazepril HCTZ in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Benazepril HCTZ sold in the United States at collusive and noncompetitive prices.

47.     The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

48.     As a result of Defendants' unlawful agreement to restrain trade, Plaintiff and members of the Classes were injured because they paid, and continue to pay, supracompetitive prices for Benazepril HCTZ sold in the United States during the period October 1, 2013 through the present.

## THE GENERIC MARKET FOR BENAZEPRIL HCTZ
## SUSCEPTIBLE TO A PRICE-FIXING CONSPIRACY

**A.     Factors Supporting the Existence of a Conspiracy in the Benazepril HCTZ Market**

49.     The structure and other characteristics of the market for Benazepril HCTZ make it conducive to collusion and price-fixing. Specifically, the Benazepril HCTZ market exhibited: (1) high barriers to entry; (2) inelasticity of demand; (3) a high degree of commoditization; (4) a high degree of concentration; (5) competitors acting against their economic self-interest; and (6) opportunities to conspire.

**1.     There Are High Barriers to Entry in the Markets for Generic Drugs, Including Benazepril HCTZ**

50.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

51.     The Benazepril HCTZ markets have high barriers to entry.

52.     Even though Benazepril HCTZ are not protected by any patents, regulatory hurdles and the costs of doing business make market entry difficult, time consuming, and expensive. Any generic drug manufacturer seeking to enter the Benazepril HCTZ markets must file an ANDA and receive FDA approval.

53.     To file an ANDA, the generic manufacturer must show that the generic product is bioequivalent to its branded counterpart and invest considerable resources in the development of production lines capable of making the drug. Historically, the cost of filing an ANDA is about $1 million.[10] A generic manufacturer's production facilities must also meet Current Good Manufacturing Practice, which increase the costs of production.

54.     Moreover, a generic manufacturer that cannot produce the Active Pharmaceutical Ingredient ("API") for Benazepril HCTZ must have a reliable and affordable source of API for these products.

55.     Prospective generic manufacturers must also be able to satisfy FDA regulations and guidance governing bioequivalence and bioavailability of Benazepril HCTZ. This requires showing that the proposed generic Benazepril HCTZ products have, among other things, the same therapeutic qualities and absorption profiles as their branded counterpart.

56.     The failure to meet all FDA requirements concerning manufacturing, testing, and labeling of Benazepril HCTZ will result in the FDA delaying (or denying) approval of an ANDA. These delays can last for months or even years.

57.     Even if a non-conspiring generic manufacturer were to see an opportunity to compete on price regarding Benazepril HCTZ, due to the fact that the FDA's review of ANDAs is currently significantly "backlogged," any potential entrant would necessarily be delayed for

---

[10] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), at 7.

years.[11] Indeed, the FDA has stated that as of fiscal year 2015, ANDA approvals can take 40 months or more.[12]

### 2.    Demand for Benazepril HCTZ Is Inelastic

58.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

59.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

60.    Demand for Benazepril HCTZ is highly inelastic because it is a unique product for which there are no reasonable substitutes.

61.    Benazepril and hydrochlorothiazide are unique compounds that are not therapeutically equivalent to other treatments. Further, when combined, these compounds are similarly unique and have no therapeutic equivalents.

62.    Thus, purchasers of Benazepril HCTZ are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

---

[11] *Id.* at 7.

[12] GAO, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases*, No. 16-706, at 26 (Aug. 2016), http://www.gao.gov/assets/680/679022.pdf.

### 3. Benazepril HCTZ Is a Commodity Product

63.     When products are subject to commoditization, producers of those products are usually forced to compete on price, as opposed to other factors, such as quality and ancillary services. When price becomes a significant factor in driving demand for a product, producers of a commoditized product have an easier time colluding on price than other non-price factors because price-based collusion is much easier to implement and monitor.

64.     Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. Indeed, state laws require that pharmacists substitute available AB-rated generic drugs for their branded counterparts precisely because of their lower price. Defendants' Benazepril HCTZ products are AB-rated generics to their branded counterparts, enabling substitution.

65.     Moreover, because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's product is through price reductions.[13] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 4. The Generic Benazepril HCTZ Market Is Highly Concentrated

66.     A concentrated market is more susceptible to collusion and other anticompetitive practices.

67.     The Benazepril HCTZ market is highly concentrated. Although there were at least six manufacturers in 2005, now only two companies—Defendants here—controlling nearly the

---

[13] *See* Congressional Budget Office, Promotional Spending for Prescription Drugs, Economic & Budget Issues Brief (Dec. 2, 2009), at 1.

entire market. The only other generic manufacturer in the Benazepril HCTZ market is Apotex, Inc. ("Apotex"). However, Apotex has provided little in the way of price competition.

68.     With few competing manufacturers in the market, Defendants are easily able to coordinate pricing of their respective products. This concentration also made it easy for them to monitor prices in the downstream market and police deviations from agreed-upon prices.

69.     As the only players in the Benazepril HCTZ market, Defendants were able to fix, raise, and maintain their prices on these products without competitive threats from rival generic drug manufacturers.

### 5.     Defendants' Pricing of Benazepril HCTZ Was Against Their Self-Interest

70.     Competitive firms in a competitive, commoditized marketplace will typically price their products aggressively, relative to their competitors' products. Firms price aggressively with the understanding that if they do not do so, other competitors will undercut their relatively high price, taking sales—and ultimately market share—away from the firms that are pricing less aggressively.

71.     Here, however, rather than attempt to take sales, revenue, and market share away from one another, Defendants instead sought to meet the price increases made by others and extract supracompetitive prices from Plaintiff and members of the Classes.

72.     Such conduct was against each Defendant's self-interest because rather than cut prices to gain sales, revenues, and market share, each Defendant instead sought to sacrifice these potential gains in favor of cartel pricing. Defendants' individual failures to cut prices in the face of price increases from competitors suggest that Defendants were conspiring to fix and raise prices, rather than competing on price.

### 6. Memberships in the Same Trade Associations Provided Defendants with Opportunities to Conspire

73.     To sustain a conspiracy, the conspirators must periodically communicate to ensure that all are adhering to the collective scheme. Here, these meetings occurred primarily through (1) trade association meetings and conferences, and (2) private meetings, dinners and outings among smaller groups of generic drug manufacturers.

### (a)     Trade Association Meetings and Conferences

74.      Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Benazepril HCTZ,  and how to allocate markets and customers for Benazepril HCTZ, including, but not limited to, GPhA, the National Association of Chain Drug Stores ("NACDS"), and Healthcare Distribution Management Association (now known as the Healthcare Distribution Alliance) ("HDMA").

*GPhA:* GPhA is the largest trade association for generic and biosimilar manufacturers. Defendants and their senior executives are active members of the GPhA.  For example, a number of Defendants' high-ranking corporate officers served on GPhA's Board of Directors before and during the Class Periods:

(a)     2012 Board of Directors: Tony Mauro, President of Mylan Pharmaceuticals, Chairman; Don DeGolyer, President and CEO of Sandoz, Inc., Vice Chairman;

(b)     2013 Board of Directors: Tony Mauro, President of Mylan North America, Chairman; Don DeGolyer, President and CEO, Sandoz US, Vice Chairman;

(c)     2014 Board of Directors: Peter Goldschmidt, President, Sandoz US; Tony Mauro, President, Mylan Inc.;

(d)      2015 Board of Directors: Peter Goldschmidt, President, Sandoz US;

Marcie McClintic Coates, VP and Head of Global Regulatory Affairs, Mylan Inc.;

(e)      2016 Board of Directors: Heather Bresch, Mylan CEO, Chair;  Peter

Goldschmidt, President, Sandoz US.

75.      Representatives of Defendants frequently attend GPhA sponsored events and

conferences. Defendants' representatives attended many meetings held by GPhA, including the

following between 2014 and 2015:

| Meeting | Meeting Date and Location | Attendees |
|---|---|---|
| 2013 GPhA Annual Meeting | February 20 - 22, 2013 Orlando, Florida | Mylan and Sandoz |
| 2013 GPhA CMC Workshop | June 4 - 5, 2013 Bethesda, Maryland | Mylan and Sandoz |
| 2013 GPhA Fall Technical Conference | October 28 to 30, 2013 Bethesda, Maryland | Mylan and Sandoz |
| 2014 GPhA Annual Meeting | February 19 to 21, 2014 Orlando, Florida | Mylan and Sandoz |
| 2014 GPhA CMC Workshop | June 3-4, 2014 Bethesda, Maryland | Mylan and Sandoz |
| 2014 GPhA Fall Technical Conference | October 27 to 29, 2014 Bethesda, Maryland | Mylan and Sandoz |
| 2015 GPhA Annual Meeting | February 9 to 11, 2015 Miami, Florida | Mylan and Sandoz |
| 2015 GPhA CMC Workshop | June 9 to 10, 2015 Bethesda, Maryland | Mylan and Sandoz |
| 2015 GPhA Fall Technical Conference | November 2 - 4, 2015 North Bethesda, Maryland | Mylan and Sandoz |

76.      ***NACDS:*** NACDS is a national trade association representing chain community

pharmacies. Its members include drug manufacturers, wholesalers, and retail chain pharmacies.

Defendants Sandoz and Mylan are members of NACDS. NACDS holds regular industry events,

including annual and regional conferences, which Defendants and other generic manufacturers

attended, including the annual Total Store Expo.

77.     **HDMA**: HDMA is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[14] HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. HDMA members include Defendants Sandoz and Mylan as well as certain of their employees.[15]

78.     As uncovered in the state attorneys' general investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers. These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows. Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

### (b)     Private Meetings, Dinners, and Outings

79.     In addition to trade association meetings and events, Defendants, and other generic manufacturers often participated in smaller group dinners and other private meetings. A large number of generic drug manufacturers, including nearly all Defendants here, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.

80.     As uncovered by the state attorneys' general investigation, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners." For example, in January 2014, at a time when the prices of a

---

[14] https://www.healthcaredistribution.org/about.

[15] http://www.healthcaredistribution.org/about/membership/manufacturer/manufacturer-members.

number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

81.     Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners. During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information. Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

## GOVERNMENT INVESTIGATIONS INTO GENERIC DRUG PRICING

### A.     DOJ and State Attorneys General File Their First Complaints Alleging That Generic Drug Manufacturers Conspired to Fix Prices, Rig Bids, and Allocate Customers and Markets

82.     On December 12 and 13, 2016, the DOJ filed its first charges in connection with its two-year investigation into collusion in the generic pharmaceuticals industry. DOJ charged former Heritage Pharmaceutical executives Jeffrey Glazer and Jason Malek each with two felony counts under the Sherman Act, for conspiring with others to fix prices, rig bids, and allocate customers for doxycycline and glyburide. According to reports, Messrs. Glazer and Malek are cooperating with DOJ's continued investigation.[16]

83.     The DOJ alleged that Glazer and Malek conspired with others to fix prices and rig bids for, and allocate customers of, doxycycline at least as early as April 2013 and continuing through at least December 2015. The DOJ also alleged that both conspired with others to fix prices and rig bids for, and allocate customers of, glyburide at least as early as April 2014 and

---

[16] Tom Schoenberg, David McLaughlin, and Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), http://bloom.bg/2hNRrpb.

continuing through at least December 2015. On January 9, 2017, Glazer and Malek pleaded guilty to the charges.

84.     Soon after the DOJ filed criminal charges, 20 state attorneys general sued generic drug manufacturers Aurobindo Pharma, Citron Pharma, Heritage, Mayne Pharma, Mylan, and Teva for their scheme to rig bids and fix and maintain prices for, and allocate customers of, doxycycline and glyburide. According to their complaint, the state attorneys general have uncovered collusive conduct involving "numerous different drugs and competitors, which will be acted upon at the appropriate time."[17] On March 1, 2017, the state attorneys general complaint was amended to, *inter alia*, add claims of an additional 20 state attorneys general, bringing the total number of state AGs prosecuting the action to 40.

85.     The state attorneys general allege that Heritage acted as a "ringleader" conspiring with other companies on a wide range of drugs. These conspiracies were orchestrated and maintained through frequent meetings and communications between each conspirator's sales executives. As alleged above, the conspirators met at trade shows, conferences, and outings sponsored by numerous trade associations. In addition to these public events, the state attorneys general alleged that the conspiring generic manufacturers held private industry dinners and outings, including GNOs alleged above.

**B.      Ongoing Federal and State Antitrust Investigations into Generic Drug Pricing**

86.     The complaints filed by the DOJ and state attorneys general are just the beginning, and their respective investigations continue. Several generic drug manufacturers, including Defendants Sun and Mylan have received subpoenas or requests for information

---

[17] Compl. at ¶ 9, *Connecticut v. Aurobindo Pharma USA, Inc.*, 16-cv-02056 (D. Conn., filed Dec. 14, 2016).

concerning their pricing of generic drugs, as well as their communications with their competitors for those drugs.

87.     Initial reports suggest that, at the beginning, the probes were focused on two generic drugs: digoxin and doxycycline. However, recent news reports have confirmed the sweeping nature of the DOJ's investigation: at least two-dozen drugs and a dozen drug companies are under criminal investigation.

88.     A federal grand jury investigating the matter is empaneled in the Eastern District of Pennsylvania. The result of these investigations could result in the imposition of substantial fines and criminal pleas for generic manufacturers, and jail time for company executives. Some analysts have estimated that the DOJ could impose fines in excess of $1 billion.[18]

89.     To date, the following generic drug companies have been contacted in connection with both federal and state antitrust probes:

90.     *Mylan.* Mylan disclosed in a 2016 SEC filing that it received a subpoena from DOJ "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products."[19] Mylan received a similar subpoena from the CTAG, seeking "information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[20]

91.     More recently, on November 10, 2016, Mylan disclosed that DOJ issued a subpoena to Mylan and certain employees and senior management "seeking additional

---

[18] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

[19] Mylan, SEC 2015 Form 10-K, at 160.

[20] *Id.*

information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products."[21] Significantly, Mylan disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[22]

92.    **Sandoz.** On March 24, 2016, Sandoz received a subpoena from the DOJ requesting documents related to the market and pricing of generic drugs, as well as communications with competitors since 2012.[23]

93.    **Actavis.** Actavis's parent Allergan plc disclosed in public filings that they received subpoenas from DOJ. Allergan reported that, on June 25, 2015, Actavis received a subpoena from DOJ "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[24]

94.    **Impax.** In July 2014, Impax disclosed in received a subpoena from the CTAG concerning Impax's sales of generic digoxin and whether it agreed with others to fix prices or allocate customers or territories. In November 2014, Impax disclosed that it also received a federal grand jury subpoena requesting testimony and documents about "any communication or correspondence with any competitor about the sale of generic drugs."[25] The scope of the subpoenas was not limited to a particular drug or a particular timeframe.

---

[21] Mylan SEC Form 10-Q, at 58 (Nov. 10, 2016), http://apps.shareholder.com/sec/viewerContent.aspx?companyid=ABEA-2LQZGT&docid=11678486#MYL10Q_20160930XDOC_HTM_S582E80BDD4215D11A4040D12D4C2E297.

[22] *Id.*

[23] James Paton & Yaacov Benmeleh, *Novartis Says Generics Unit Received Subpoena in March in U.S.*, Bloomberg Law (Nov. 9, 2016).

[24] Allergan, SEC 2015 Form 10-K, at F-106.

[25] Impax SEC Form 8-K (Nov. 6, 2014), https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

95.     Later, Impax further disclosed that on March 13, 2015, "the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular the Justice Department's investigation currently focuses on four generic medications: digoxin, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[26]

96.     **Sun.** On or about May 28, 2016, Sun disclosed that it had received a subpoena from DOJ "seeking information about the pricing and marketing of the generic drugs it sells in the United States."[27] DOJ also sought documents related to "employee and corporate records and communications with competitors."[28]

97.     **Teva.** On August 4, 2016, Teva disclosed that "[o]n June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[29] In that same filing, Teva disclosed that on July 12, 2016, "Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."[30]

---

[26] Impax, SEC 2015 Form 10-K, at F-53.

[27] India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing, Fortune (May 28, 2016), http://fortune.com/2016/05/28/sun-pharma-drug-price-subpoena.

[28] *Id.*

[29] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-SECText&TEXT=aHR0cDovL2FwaS5tZW5yd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMDcyODU1JkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

[30] *Id.*

98.     **Par.** In an SEC Form 10-K for 2014, Par disclosed that it had received a subpoena

from DOJ "requesting documents related to communications with competitors regarding our

authorized generic version of Covis's Lanoxin® (digoxin) oral tablets and our generic

doxycycline products."[31] Moreover, in that same filing Par revealed that the CTAG served a

subpoena on Par on August 6, 2014 "requesting documents related to our agreement with Covis

Pharma S.a.r.l. to distribute an authorized generic version of Covis's Lanoxin® (digoxin) oral

tablets."[32] Par stated that it completed its response on October 28, 2014.

99.     **Lannett.** In July 2014, Lannett revealed in SEC filings that they had received

subpoenas from the CTAG in connection with its investigation into whether "anyone engaged in

a contract, combination or conspiracy in restraint of trade or commerce which has the effect of

(i) fixing, maintaining or controlling prices of digoxin or (ii) allocating and dividing customers

or territories relating to the sale of digoxin in violation of Connecticut antitrust law."[33]

100.     The information and documents sought by the CTAG included: (1) the

identification of "all persons at Lannett with any supervisory, executive or other significant non-

ministerial responsibility related to the pricing or sale of Digoxin"; (2) the identification and

production of "all documents or communications referring or relating to any decision(s), by you

or any other company, to increase the price of Digoxin"; (3) the production of "[a]ll marketing

plans, strategic plans or any other documents relating to the development, manufacture and

---

[31] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K, at 37.

[32] *Id.*

[33] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG, http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html; Lannett Receive Inquiry from Connecticut Attorney General, http://finance.yahoo.com/news/lannett-receives-inquiry-connecticut-attorney-153300612.html.

commercialization of Digoxin"; and (4) the identification and production of "written compliance policy directed to the antitrust laws."

101.   ***Dr. Reddy's***. On or about August 11, 2016, Dr. Reddy's disclosed in an SEC filing that it had received a subpoena from the DOJ on July 6, 2016, "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[34] In that same filing, Dr. Reddy's disclosed that it had received a subpoena from the CTAG concerning the same matters.

102.   ***Citron.*** On December 21, 2016, ACETO Corporation, a company which recently purchased Citron's generic assets in December 2016, disclosed that the "Antitrust Division of the U.S. Department of Justice executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ."[35] ACETO also disclosed that in September 2016, the CTAG requested that Citron produce all documents produced to DOJ.

103.   ***Mayne.*** In its 2016 Annual Report, Mayne Pharma Ltd. disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena form the Antitrust Division of the US Department of Justice [] in the last two years seeking information relating to marketing, pricing and sales of select generic drugs."[36] In the same Annual Report, Mayne Pharma also disclosed that it had received a subpoena from the CTAG seeking similar information.

---

[34] Dr. Reddy's, SEC Form 6-K (Aug. 31, 2016).
[35] Aceto Corp., SEC Form 8-K, Ex. 99.5.
[36] Mayne Pharma, 2016 Annual Report, at 75.

104.   **Taro.** On September 9, 2016, Taro disclosed that on September 8, 2016, it and two senior officers in Taro's commercial team, "received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[37]

105.   **Zydus.** Although Zydus is not publicly traded in the United States and thus not subject to reporting requirements under federal securities laws, recent press reports have stated the Zydus is also a target of the DOJ's sweeping investigation.[38] According to one article, Zydus is being investigated in connection with its marketing and sale of divalproex ER.[39]

### C.   Congressional Investigations into Generic Drug Pricing

106.   As news reports have proliferated with respect to the dramatic rise in price of certain generic drugs, members of Congress have expressed a growing concern as to what is driving these price hikes. On October 2, 2014, Representative Elijah E. Cummings, the Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernard Sanders, Chairman of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, "sent letters to 14 drug manufacturers requesting

---

[37] Taro, SEC Form 6-K (Sept. 9, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMTM0MjUwJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

[38] Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India, http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms.

[39] *Hillary win may pose pricing challenges for pharma cos: Report*, F. World (Nov. 7, 2016), http://www.firstpost.com/world/hillary-win-may-pose-pricing-challenges-for-pharma-cos-report-3093544.html.

information about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses."[40]

107.    These letters were delivered to the heads of Mylan, Actavis, Apotex, Dr. Reddy's, Impax, Par Pharmaceutical, Teva, Zydus, Endo, Heritage Pharmaceuticals, and Marathon Pharmaceuticals, seeking information about the pricing of divalproex ER, pravastatin, digoxin, doxycycline, albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, Benazepril HCTZ, Isuprel® (isoproterenol hydrochloride), and Nitropress® (nitroprusside).

108.    Each letter stated:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community of Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients['] and pharmacies['] ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."[41]

109.    In addition to sending letters to the generic drug manufacturers listed above, Senator Sanders and Representative Cummings wrote a joint letter to Sylvia Burwell, the

---

[40] Ranking Members Cummings and Chairman Sanders Investigate Staggering Price Increases for Generic Drugs, http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

[41] *See, e.g.*, Ltr. from Sen. Bernard Sanders & Rep. Elijah E. Cummings to Arthur P. Bedrosian (Oct. 2, 2014), http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-and-ceo-lannett-company-inc?inline=file (citing Letter from B. Douglas Hoey to Sen. Tom Harkin, et al. (Jan. 8, 2014), https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf)).

Department of Health and Human Services Secretary, stating, "The federal government must act immediately and aggressively to address the increasing costs of these drugs."[42]

110.    The Senate Subcommittee on Primary Health and Aging held a hearing on November 20, 2014. Although the Presidents and CEOs of Lannett, Teva, and Marathon Pharmaceuticals were scheduled to attend the hearing, none appeared. Many panelists agreed that reduced competition across various generic drugs has contributed to the price hikes observed in the overall market.

111.    Subsequent congressional hearings concerning the dramatic rise of generic drug prices were held in December 2015 and February 2016. At the U.S. Senate Special Committee on Aging's December 9, 2015 hearing, Erin D. Fox, PharmD Director of the Drug Information Service of the University of Utah, noted the deleterious effect these drug prices have had on patient access and healthcare, stating, "When medication prices increase in an unpredictable and dramatic way, this can create an access issue for hospitals and patients. If hospitals cannot afford to stock a product in the same amount due to price increases, this effectively creates a shortage."[43]

112.    On February 24, 2015, Senator Sanders and Representative Cummings wrote to Daniel R. Levinson, the Inspector General of the Department of Health and Human Services, imploring the department to "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare

---

[42] Congressional Panel to Probe Generic Drug Price Hikes (Nov. 11, 2014), http://www.sanders.senate.gov/newsroom/press-releases/congressional-panel-to-probe-generic-drug-price-hikes.

[43] Statement of Erin R. Fox, PharmD Director, Drug Information Service, Hearing on "Sudden Price Spikes in Off-Patent Drugs: Perspectives from the Front Lines" (Dec. 9, 2015), at 7, http://www.aging.senate.gov/imo/media/doc/SCA_Fox_12_9_15.pdf.

and Medicaid programs."[44] On April 13, 2015, Inspector General Levinson responded to Senator Sanders and Representative Cummings's letter, stating that his office planned "to update our previous review of generic drug price increases under the Medicaid drug rebate program."[45]

## ANTITRUST IMPACT

113.    During the relevant period, Plaintiff and members of the Classes purchased substantial amounts of Benazepril HCTZ indirectly from Defendants. As a result of Defendants' illegal conduct, these purchasers have paid, and continue to pay, artificially inflated prices for Benazepril HCTZ. The prices paid were substantially higher than the prices that Plaintiff and members of the Classes would have paid absent the illegal conduct alleged in this Complaint.

114.    As a consequence, purchasers of Benazepril HCTZ have sustained substantial losses and damage to their business and property in the form of overcharges—and their losses continue to date. The full amounts, forms, and components of such damages will be calculated after discovery and upon proof at trial.

115.    Defendants' efforts to restrain competition in the market for Benazepril HCTZ have substantially affected intrastate and interstate commerce—and continue to do so.

116.    At all material times, Defendants manufactured, promoted, distributed, and sold substantial amounts of Benazepril HCTZ in a continuous and uninterrupted flow of commerce throughout the United States. Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase because, among other things, consumers and third-party payors within each state were forced to pay supracompetitive prices for Benazepril HCTZ.

---

[44] Letter from Hon. Bernard Sanders and Elijah Cummings to Hon. Daniel Levinson (Feb. 24, 2015), http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[45] Letter from Hon. Daniel Levinson to Hon. Bernard Sanders (Apr. 13, 2015), http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

117.    At all times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of Benazepril HCTZ.

118.    Economists recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top. [46] He also says that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[47]

119.    The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Benazepril HCTZ to Plaintiff and members of the Classes.

120.    Defendants' anticompetitive conduct enabled Defendants to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent Defendants' unlawful actions.

121.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

122.    The inflated prices that Plaintiff and members of the Classes have paid for Benazepril HCTZ, and continue to pay, are traceable to and the foreseeable result of, the overcharges by Defendants.

---

[46] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

[47] *Id.*

## CLASS ALLEGATIONS

123.    Plaintiff brings this action as a class action, under Fed. R. Civ. P. 23(a) and (b)(2),

on behalf of itself and a nationwide class of similarly situated individuals seeking injunctive and

equitable relief:

> **The Injunctive Class**:
>
> All persons or entities in the United States and its territories who
> indirectly purchased, paid, and provided reimbursement for some
> or all of the purchase price for Benazepril HCTZ, other than for
> resale, for consumption by themselves, their families, or their
> members, employees, insureds, participants, or beneficiaries, from
> at least as early as October 1, 2013 through the present.

124.    Plaintiff also brings this action as a class action, under Fed. R. Civ. P. 23(a) and

(b)(3), on behalf of itself and a class of similarly situated individuals seeking damages arising

from Defendants' conduct as described below:

> **The Damages Class**:
>
> All persons or entities who in Alabama, Arizona, California,
> Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan,
> Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New
> York, North Carolina, North Dakota, Oregon, Rhode Island, South
> Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and
> the District of Columbia indirectly purchased, paid, and provided
> reimbursement for some or all of the purchase price for Benazepril
> HCTZ from at least as early as October 1, 2013 through the
> present.

125.    The following persons and entities are excluded from the above-described

Classes:

(a)    Defendants and their counsel, officers, directors, management, employees,

subsidiaries, or affiliates;

(b)    All governmental entities, except for government-funded employee benefit

plans;

(c)     All persons or entities who purchased Benazepril HCTZ for purposes of resale or directly from Defendants or their affiliates;

(d)     Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

(e)     Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); and

(f)     The judges in this case and any members of their immediate families.

126.    Members of the Classes are so numerous that joinder is impracticable. Plaintiff believes that there are thousands of members of each Class.

127.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct by Defendants in that they paid artificially inflated prices for Benazepril HCTZ as a result of Defendants' wrongful conduct—and continue to do so.

128.    Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.

129.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with experience in class action antitrust litigation involving pharmaceutical products.

130.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to each member of the Injunctive Class and Damages Class.

131.     Questions of law and fact common to members of both Classes include:

(g)     the identity of the participants in the conspiracy;

(h)     whether Defendants conspired to fix, raise, maintain, and stabilize the prices of Benazepril HCTZ;

(i)     whether Defendants conspired to rig bids for Benazepril HCTZ;

(j)     whether Defendants conspired to allocate markets or customers with respect to the Benazepril HCTZ;

(k)     whether Defendants' conduct harmed competition in the Benazepril HCTZ markets;

(l)     whether Defendants' activities alleged herein have substantially affected interstate and intrastate commerce;

(m)     whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiff and members of the Classes in the nature of overcharges;

(n)     the amount of overcharges paid by Plaintiff and members of the Classes in the aggregate; and

(o)     the injunctive and other equitable relief needed to end Defendants' restraint and to restore competition in the Benazepril HCTZ markets.

132.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining

redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

133.    Plaintiff knows of no special difficulty to be encountered in this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Sherman Act § 1, 15 U.S.C. § 1
### (By Plaintiff and Injunctive Class Members Against All Defendants)

134.    Plaintiff incorporates the preceding paragraphs by reference.

135.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to rig bids and fix, raise, and maintain, the prices of, and allocated customers and markets for, Benazepril HCTZ—and continue to do so.

136.    Had Defendants competed instead of conspiring to restrain trade, Plaintiff and Injunctive Class Members would have paid substantially lower prices for Benazepril HCTZ.

137.    Defendants intended, and accomplished, a bid-rigging, price-fixing conspiracy and horizontal customer and market allocation for Benazepril HCTZ, which are *per se* violations of Section 1 of the Sherman Act. By their agreement, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and Injunctive Class Members paid artificially inflated prices for Benazepril HCTZ—and continue to do so.

138.    Plaintiff and Injunctive Class Members have suffered harm, and are continuing to suffer harm, as a result of paying higher prices for Benazepril HCTZ than they would have absent Defendants' anticompetitive conduct and continuing anticompetitive agreements. Plaintiff

and Injunctive Class Members also face a continuing threat of injury from the unlawful conduct alleged in this Complaint.

139.    Plaintiff and Injunctive Class Members have purchased substantial amounts of Benazepril HCTZ indirectly from Defendants.

140.    Plaintiff and Injunctive Class Members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that Defendants' conduct violates Section 1 of the Sherman Act.

141.    Plaintiff and Injunctive Class Members also seek equitable and injunctive relief, including disgorgement of profits, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## SECOND CLAIM FOR RELIEF

### State Antitrust Violations
### (By Plaintiff and Damages Class Members Against All Defendants)

142.    Plaintiff incorporates the preceding paragraphs by reference.

143.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to rig bids and fix, raise, and maintain, the prices of, and allocated customers and markets for, Benazepril HCTZ—and continue to do so.

144.    Defendants' unlawful conduct harmed Plaintiff and Damages Class Members in the manner explained above.

145.    Defendants' unlawful conduct covered a sufficiently substantial percentage of the relevant market to harm competition.

146.    Defendants' actions constitute horizontal market allocation and price-fixing agreements between actual and potential competitors and are illegal *per se* under state antitrust laws.

147.    Defendants' supracompetitive pricing constitutes a continuing violation of the laws of the states listed below in that each purchase by Plaintiff or a member of the Damages Class of supracompetitively priced Benazepril HCTZ caused injury to their business or property—and continues to do so.

148.    Defendants' conduct violated the following state laws:

(a)    Ala. Code § 6-5-60, with respect to purchases in Alabama by members of the Damages Class;

(b)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Damages Class;

(c)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Damages Class;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Damages Class;

(e)    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Damages Class;

(f)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by members of the Damages Class;

(g)    Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa by members of the Damages Class;

(h)     Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Damages Class;

(i)     Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Damages Class;

(j)     Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Damages Class;

(k)     Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Damages Class;

(l)     Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Damages Class;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class;

(n)     Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Damages Class;

(o)     Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Damages Class;

(p)     N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Damages Class;

(q)     N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the Damages Class;

(r)     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by members of the Damages Class;

(s)     N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by members of the Damages Class;

(t)     Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by members of the Damages Class;

(u)     R.I. Gen. Laws §§ 6-36-1 *et seq.*, with respect to purchases in Rhode Island by members of the Damages Class;

(v)     S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by members of the Damages Class;

(w)     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Damages Class;

(x)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by members of the Damages Class;

(y)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Damages Class;

(z)     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Damages Class; and

(aa)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Damages Class.

149.    Plaintiff and Damages Class Members have been and continue to be injured in their business or property by Defendants' antitrust violations. Their injuries consist of: (1) being denied free and open competition between competitors in the Benazepril HCTZ market; and (2) paying higher prices for Benazepril HCTZ than they would have paid in the absence of

Defendants' wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

150.    Plaintiff and Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

151.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and Damages Class Members.

152.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the above-listed state antitrust laws.

### **THIRD CLAIM FOR RELIEF**

**Unjust Enrichment**
**(By Plaintiff and Damages Class Members Against All Defendants)**

153.    Plaintiff incorporates the preceding paragraphs by reference.

154.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

155.    Defendants have benefited and continue to benefit from the overcharges on sales of Benazepril HCTZ made possible by the unlawful and inequitable acts alleged in this Complaint.

156.    Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for Benazepril HCTZ.

157.    Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and Damages Class Members.

158.    It would be futile for Plaintiff and Damages Class Members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiff and Damages Class Members.

159.    It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Benazepril HCTZ, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

160.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Benazepril HCTZ is a direct and proximate result of Defendants' unlawful practices.

161.    The financial benefits Defendants derived rightfully belong to Plaintiff and Damages Class Members, who paid, and continue to pay, anticompetitive prices that inured to Defendants' benefit.

162.    It would be inequitable under unjust enrichment principles under the laws of each of the states in the United States and the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for Benazepril HCTZ that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

163.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.

164.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members.

165.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received that are traceable to Plaintiff and Damages Class Members.

166.    Plaintiff and Damages Class Members have no adequate remedy at law.

## DEMAND FOR JUDGMENT

Accordingly, Plaintiff, on its own behalf and on behalf of the proposed Classes, demands judgment that:

A.    Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to members of the Classes under Rule 23(c)(2), and declares that Plaintiff is a proper representative of the Classes;

B.    Declares that Defendants' conduct violated Section 1 of the Sherman Act, the other state statutes set forth above, and the common law of unjust enrichment;

C.    Enjoins Defendants from continuing their illegal activities;

D.    Enters judgment against Defendants joint and severally and in favor of Plaintiff and the Classes;

E.    Grants Plaintiff and the Injunctive Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

F.    Awards the Plaintiff and the Damages Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.    Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed classes, demands a trial by jury on all issues so triable.

Dated: March 15, 2017

FINE, KAPLAN AND BLACK, R.P.C.

By: *Roberta D Liebenberg*

ROBERTA D. LIEBENBERG
PAUL COSTA
ADAM J. PESSIN
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

**LABATON SUCHAROW LLP**
GREGORY S. ASCIOLLA
JAY L. HIMES
KARIN E. GARVEY
DOMENICO MINERVA
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
dminerva@labaton.com
mperez@labaton.com
rjulius@labaton.com

*Counsel for  UFCW Local 1500 Welfare Fund and the Proposed Classes*